William E. WILSON, Plaintiff,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.

No. C–81–759–JLQ.

United States District Court, E.D. Washington.

Dec. 15, 1982.

John E. Lamp, U.S. Atty. by Robert S. Linnell, Asst. U.S. Atty., Yakima, Wash., for plaintiff.

Wade E. Gano, Yakima, Wash., for defendant.

## MEMORANDUM AND ORDER REVERSING THE SECRETARY'S DECISION

QUACKENBUSH, District Judge.

### STATEMENT OF CASE

Plaintiff, WILLIAM E. WILSON, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Secretary of Health & Human Services (HHS). That decision denied plaintiff's entitlement to disability insurance benefits. Both parties moved for summary judgment.

### ADMINISTRATIVE BACKGROUND

Mr. Wilson filed an application for disability benefits on September 10, 1980, alleging a disability onset date of July 25, 1980. (Tr. 85) In the application he claimed that the disability preventing him from working was: ulcerative colitis, arthritis of the back, aortic aneurysm, emphysema and heart problems. The application was denied initially on December 4, 1980 (Tr. 67) and was denied again upon reconsideration on January 14, 1981 (Tr. 73). A hearing was held on July 10, 1981, in Yakima, Washington, before an Administrative Law Judge (ALJ). The applicant appeared personally, testified and was represented by counsel. (Tr. 27–60).

On September 18, 1981, the ALJ rendered his decision that Mr. Wilson was not disabled as defined by law. (Tr. 7–12).

The ALJ made the following findings:

1. The claimant filed application for Title II, disability insurance benefits, on September 10, 1980, alleging inability to work from July 24, 1980.

2. The claimant met the earnings requirements of the Social Security Act, as amended, on July 24, 1980, the date of alleged "disability", and continues to meet them through the date of this decision.

3. The claimant is 58 years of age and has 16 years of education.

4. The claimant has worked as an assistant director in college administration.

5. The claimant's medical conditions consist of: colitis, arthritis in back, emphysema, aneurysm, and heart problems; none of which either singly or in combination have resulted in any significant degree of loss of function.

6. The claimant medicates with Quinidine, Motrin, Lanoxin, and Prednisone, as of May 29, 1981.

7. The claimant can return to his former work as an academic administrator.

(Tr. 11–12).

The Appeals Council adopted the ALJ's decision as the final decision of the Secretary. (Tr. 3). Mr. Wilson then pursued an appeal to the United States District Court for the Eastern District of Washington.

## STANDARD OF REVIEW

This court is limited to the question of whether the findings of the Secretary are supported by substantial evidence. *Vidal v. Harris,* 637 F.2d 710, 712 (9th Cir.1981). The court must uphold a determination of no disability if the findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". *Id.*

## FACTUAL BACKGROUND

Mr. Wilson was born on April 10, 1923 (Tr. 27) and has a college education. (Tr. 33). He volunteered for the Navy in 1942 and was discharged in 1946. (Tr. 29). While in the Navy he was a motor machinist mate and worked on large diesel engines. (Tr. 30). He enlisted in the Army in 1949 and retired in June 1966. In the Army he worked in heavy equipment engineering maintenance until 1961 (Tr. 31) when he became a recruitment and re-enlistment counselor. (Tr. 32). He worked in recruiting in Texas, France and Washington. (Tr. 32). While in the Army he had a duodenal ulcer on which a vagectomy was performed in January 1965 and complained of back trouble. (Tr. 35). He is not receiving VA benefits. (Tr. 29). After retirement from the Army, he attended Wenatchee Valley College where he studied liberal arts and worked in the Counseling Center with veterans and other students. (*Id.*) Upon graduating in June 1968, he studied psychology at Central Washington State College and worked in the Counseling Center and the Office of Financial Aid. (*Id.*). Following graduation in June of 1970, he was employed as Assistant Financial Aid Director at Central Washington State College until granted medical leave without pay in July 1980. (Tr. 33–34). Mr. Wilson had varied early work experience in farm chores, fruit picking, construction, sawmill and fresh fruit and vegetable processing (Tr. 28–30).

In 1977, during his employment as a Financial Aid Officer, he began to experience numerous conditions for which he sought medical advice. (Tr. 37–41). Claimant testified that in 1977 he had diarrhea 15—20 times a day and his weight dropped from about 195 pounds to about 160 pounds. (Tr. 36–37). He testified that Dr. McKee treated him with Lomotil and diagnosed ulcerative colitis. (Tr. 37). In January 1979, his weight was 173 pounds and he experienced fatigue, stress, lower back pain, and chronic obstructive pulmonary disease (COPD). (Tr. 194–95). In February 1979, he had a bout of diarrhea (resolved by steroids), suffered stress related fatigue, and his weight was 172 pounds. By July 1979, his weight was 164 pounds and he experienced low back pain, stress, breathing problems and cardiac arrythemia. (Tr. 193). In August 1979, a five cm. abdominal aortic aneurysm was diagnosed. During the first months of 1980, he continued to experience heart and breathing problems, loss of weight, low back pain. (Tr. 185–86). He worked until July 24, 1980 when he was hospitalized for about two weeks when a right renal cyst became infected after being aspirated. (Tr. 178). He was granted a medical leave of absence without pay in July 1980. (Tr. 44). In December 1980, he was granted a medical retirement from his position as Financial Aid Director. (Tr. 208)

According to his testimony, the plaintiff continues to experience low back pain, "rapid heart beat", and loss of breath (Tr. 42–43). He can walk only a block to a block and one-half. (Tr. 45). His wife testified that he can drive a car no more than 25 miles. (Tr. 55) When asked if he thought he could perform his former job as a Financial Aid Officer at Central, he replied that there was no way that he could. Mr. Wil-

son testified that the job is stressful, requires long sitting, and that because he becomes exhausted, he could not get up and move around. (Tr. 53).

## MEDICAL EVIDENCE

Dr. McKee, an internist, first treated Mr. Wilson on June 24, 1977, for progressive fatigue, weight loss, low back discomfort, chronic cough, and diarrhea. (Tr. 201–03). Dr. McKee saw him five (5) times from June 24, 1977 to September 22, 1977. During that period claimant's weight dropped from 181 pounds to 176 pounds. He is 6'4" tall. He diagnosed ulcerative colitis and remarked that "[h]is pulmonary function studies showe[d] obstructive disease." (Tr. 201) He prescribed Lomotil for the diarrhea, and Prednisone 10 mg. and Azulfidine 500 mg.

The record shows no further treatment by Dr. McKee again until January 9, 1979, when he was consulted about the following: fatigue, pain in right lower quadrant, low back pain radiating into the buttocks. (Tr. 194). Dr. McKee's impression was that the plaintiff had: "stress reaction;" ulcerative colitis, "probable arthritis involving sacroiliac joints, perhaps related to the ulcerative colitis or degenerative joint disease;" chronic obstructive pulmonary disease; right lower quadrant discomfort, cause unknown. (Tr. 195).

During January 1979, plaintiff had several bouts of diarrhea. By February 10, 1979, his weight was 172 pounds. He was recovering from pneumonia. "I urged him to get off cigarettes and reduce the stress on his job which I think was one of the big factors with his recent fatigue ..." (Tr. 193.)

Dr. McKee examined Mr. Wilson on July 21, 1979, his weight was 164 pounds. His impression was epigastric distress, cause unknown. He noted that chest x-rays reveal COPD, "no change from February", and "[h]e continues to cough." He also noted that plaintiff was hospitalized in mid-February with cardiac arrythemia. "Stress seems to increase it". "His job continues to give him a lot of trouble emotionally." (Tr. 193). Dr. McKee examined the plaintiff on

August 3, 1979. Abdominal ultrasound revealed a 5 cm. abdominal aortic aneurysm. "He has not worked for the last few days and his abdominal pain has markedly improved." "I think that the patient should stay away from work until at least mid-month to see if this won't allow his abdominal situation to settle." Dr. McKee and Dr. Stahler, a surgeon, decided not to resection the aneurysm. (Tr. 192). Lanoxin was prescribed for PAT. (Tr. 192).

On December 17, 1979, Dr. McKee examined plaintiff and remarked that the aortic aneurysm had increased to 6cm. He noted that the plaintiff had had "a few bouts of PAT. His heart is a bit irregular today and EKG reveals a few PVC's." (Tr. 190) His weight was up to 181 pounds. (Tr. 191). On March 17, 1980, Dr. McKee noted plaintiff's weight was down to 173 pounds, the aneurysm was stable, plaintiff had had PAT, and had scattered rhonchi. (Tr. 190).

On April 17, 1980, plaintiff saw Dr. McKee for upper abdominal discomfort. His weight was 171 pounds. He had "somewhat scattered rhonchi and prolonged expiratory phase." "His pulse is 70 with three to four PVC's per minute." (Tr. 190). Dr. McKee saw plaintiff several more times. By July 11, 1980, plaintiff's weight was down to 164 pounds. The doctor remarked that chest x-ray showed only COPD. (Tr. 189).

A July 17, 1980 CT Scan showed cyst on lower pole of right kidney. (Tr. 189). From July 17, 1980 to September 29, 1980 plaintiff was seen by Dr. McKee four (4) times. (Tr. 178–81). On September 29, 1980, Dr. McKee commented that "[p]atient is on a leave of absence from his job, which I think is very appropriate. There is some question in my mind that he will be able to go back to work because of his multiple problems." (Tr. 178).

In his letter of October 3, 1980, to the Washington State Department of Retirement Systems, Dr. McKee summarized plaintiff's condition as follows:

1. Arthritis: He has a long history of low back pain with intermittent radiation

down his right lateral leg which, since latter August, has progressed to the point where he is unable to walk more than four or five blocks without having a great deal of discomfort and is unable to work even a half a day without having much discomfort in his leg and back. As a component of this, he has hyperesthesia involving the right anterior thigh. He has had no history of back injury and we have documented arthritis in his back by x-ray for some time. He has not had any disc surgery, and he does not appear to be a candidate for that presently.

2. Atherosclerotic heart disease: He has a history of episoldes of tachycardia for over one year, which we have documented as bouts of atrial fibrillation, and/or PAT, for which he takes Lanoxin prophylaxis one tablet daily and Quinidine 200 mg. three times a day with fairly decent control. He, however, had a bout of tachycardia requiring electrocardioversion while hospitalized two months ago for an infected right renal cyst.

3. Right renal cyst: He had progressive right lower quadrant discomfort which was found to be caused by a right renal cyst, which after we aspirated it attempting to determine cytology to rule out malignancy, became infected and needed a right flank drainage on 7–31–80. Subsequently, he has had discomfort in the right lower quadrant worsening when he attempts to straighten out.

4. The patient has a long history of heavy cigarette usage and has chronic obstructive pulmonary disease with an FEV–1 of only 53 percent confirmed on pulmonary function studies well over one year ago. He becomes dyspneic with moderate activity.

5. The patient has a fairly large aortic aneurysm which we have been attempting to do surgical correction, but because of his intervening problems, have not done so. *We expect that this will need to be done within the next year or so to avoid spontaneous rupture.*

6. This gentleman has had well-documented chronic ulcerative colitis which currently causes him to have one loose bowel movement a day with a fair amount of cramping without medication. His diagnoses, therefore are:

1. Degenerative joint disease with sciatica.
2. Atherosclerotic heart disease with PAT and atrial fibrillation.
3. Abdominal aortic aneurysm.
4. COPD
5. Ulcerative colitis.

(Tr. 182–83). Emphasis added.

Dr. McKee's evaluation was:

[t]his gentleman has been unable to work since his hospitalization in late July, and I believe that he is incapacitated for resumption of employment on a permanent basis. At this time, he does not appear to be a candidate for back surgery because of his other health problems and because we do not really have enough disease yet to warrant that particular step. *He will obviously need to have surgery on his aneurysm, and hopefully, we can do this before it ruptures.* This gentleman is being followed by the vascular surgeons at the Wenatchee Valley Clinic, as well as me, and I do not believe further consultation by other physicians will be of aid.

(Tr. 183). Emphasis added.

Plaintiff saw Dr. McKee three (3) times between September 29, 1980 and March 2, 1981. His multiple complaints persisted. (Tr. 176–78). On March 2, 1981, plaintiff's weight was 163 pounds. Dr. McKee noted severe dyspnea on exertion. "He has to walk around bent over or else spend time in bed." (Tr. 176). There is loss of lumbar lordosis and straight leg raising produces back pain. He diagnosed COPD with acute bronchitis. (Tr. 176).

By the April 6, 1981 examination, plaintiff's weight was 161 pounds and the aortic aneurysm measured 7cm. (Tr. 175). Dr. McKee's impressions remained the same. On May 28, 1981, plaintiff's weight had dropped to 154 pounds. The aortic aneurysm had increased to 8cm. (Tr. 173). Dr. McKee reported that plaintiff's problem is gradual loss of lung function and degenerative joint disease.

Dr. Robert P. Stevens, a pulmonary specialist, examined and tested Mr. Wilson on June 5, 1981 and June 10, 1981. X-ray showed "marked bullous disease billaterally". (Tr. 171). Dr. Stevens' primary diagnosis was emphysema and he "believe[d] he is on the 'downhill slide'." He attributed the continuing weight loss to increased work of breathing. "The PFTs show a marked deterioration since the previous studies of 1979. This is far in excess of that which would be expected on the basis of age alone." (Tr. 171). His "arterial blood gas studies ... show arterial oxygen desaturation, as well as $CO_2$ retention and the development of mild respiratory acidemia with mild exercise." (Tr. 170). On June 16, 1981, plaintiff's pulmonary function tests showed: MVV = 55, FEV = 1.11, FVC = 3.36, Arterial $PaCO_2$ = 38.4, Arterial $PaO_2$ = 63.1. (Tr. 204) Dr. Stevens' interpretation was:

> Vital capacity is moderately reduced. Lung spirometry demonstrates a severe reduction of all flows. There is no clearly significant response to bronchodilator administration. However, the FBF 200–1200 and FVC improved 15 and 22% respectively. Arterial blood gases at rest show a mild to moderate hypoxemia for age. With minimal exercise there is $CO_2$ retention and arterial oxygen desaturation. This is consistent with *severe disabling pulmonary disease....* They confirm the presence of a *very severe obstructive defect* without improvement after bronchodilator exposure. Compared to the previous studies of 1977 and 1979, *there has been dramatic deterioration in all parameters.* This is much more pronounced deterioration than would be expected on the basis of age alone.

Emphasis added.

In his letter of July 24, 1981, Dr. Stevens states that in his treatment of Mr. Wilson for chronic obstructive lung disease and emphysema, he concludes that plaintiff "is totally and permanently disabled, with regard to any type of employment." (Tr. 211) This conclusion is based on the following:

> His primary disability relates to his lung disease. From June 24, 1977 to the present time, the patient has a documented *21-pound weight loss.* I believe that this is related to the deterioration in his pulmonary function, with increased work of breathing. The patient has severe pulmonary impairment, documented by pulmonary function testing. Again, we have two pulmonary function tests confirming significant deterioration over the period of observation. I would refer you to the pulmonary function studies of August 17, 1979, and June 10, 1981. As noted, there has been dramatic deterioration far out of proportion to that which would be expected on the basis of age alone. In addition, he shows arterial oxygen desaturation with exercise, as well as carbon dioxide retention with minimal exercise. This, too, would indicate severe disabling pulmonary disease with little reserve for exertion.
>
> *We have also noted the incidental finding of an aortic aneurysm. Because of the patient's pulmonary condition, it would not be reasonable to consider operative intervention. Mr. Wilson is aware of the aneurysm. We have asked Mr. Wilson to avoid any moderately heavy lifting because of the aneurysm. This is perhaps superfluous since his lung impairment would not allow him to do so anyway.*

Emphasis added.

On July 1, 1981, Dr. McKee evaluated plaintiff's physical capacity as follows:

> *Mr. Wilson is unable to walk more than one-half block on the flat and level ground without becoming over exerted; he should not and cannot lift more than five pounds, and this only very infrequently. No walking up stairs, no sitting for prolonged periods; that is for 30 minutes at a time.*

(Tr. 209). Emphasis added.

Dr. McKee concluded that "Mr. Wilson is totally disabled from performing any kind of work". (Tr. 209).

On October 31, 1980, the State of Washington had Mr. Wilson's pulmonary function tested by Dr. Daniel S. Morris, who concluded: "[a]bnormal—moderate to severe ob-

structive impairment which does not improve with broncholilation". (Tr. 168) The test results were: MVV = 77, FEV1 = 1.82. (Tr. 168).

Dr. W. Vaughn Smith examined Mr. Wilson on December 16, 1980. Dr. Smith concluded that the burning feeling in the back and radiating down the right leg was most likely a result of the surgical procedure performed and "will recover and the present symptoms will subside completely without any particular attention." (Tr. 120) Relative to Mr. Wilson's low back pain, Dr. Smith found "only very mild degenerative joint changes in the facet joints of the lower two joints of his back." (Tr. 120). Dr. Smith diagnosed degenerative joint disease that should respond to Motrin. (Tr. 120).

At this point, it is noted that the record mistakenly also contains a medical report from Dr. Christopher Stahler (Tr. 187–88) that does *not* belong to the plaintiff. This report will be described *infra*.

DISCUSSION:

As stated earlier, the question presented in this matter is whether there exists in the record substantial evidence to support the decision of the ALJ. The ALJ found that none of the plaintiff's multiple medical conditions "singly or in combination have resulted in any significant degree of loss of function", the plaintiff "can return to his former work as an academic administrator", and is therefore not disabled as defined in the statute. (Tr. 11–12) Plaintiff contends that all medical evidence contradicts the ALJ's findings and that the plaintiff is unable to return to his former job.

■ Plaintiff has the burden of proof in establishing eligibility for disability insurance benefits under 42 U.S.C. § 423. *Hall v. Secretary of HEW,* 602 F.2d 1372, 1374–75 (9th Cir.1979). Plaintiff, therefore, must demonstrate an inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months . . .

42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). The statutory definition of a "physical or mental impairment" is one which "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1328c(a)(3)(C).

In addition, the mental and physical impairment must be:

> Of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education and work experience engage in other substantial gainful employment which exists in the national economy . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). *See also* 20 C.F.R. §§ 404.1501 *et seq.,* 416.-901 *et seq.*

The claimant's burden is met once he establishes that a physical or mental impairment prevents him from engaging in his previous occupation. *Thompson v. Schweiker,* 665 F.2d 936, 939 (9th Cir.1982). The ALJ concluded that the plaintiff failed to meet this burden when he found that Mr. Wilson's impairments neither singly nor in combination are so severe that they significantly limit his physical or mental capacity to perform his previous job of college administrator. (Tr. 9) Since he found *no* disability, the ALJ did not inquire into the plaintiff's age, education, and work experience. 20 C.F.R. § 416.920(c).

The ALJ relied on the medical reports of Drs. McKee, Smith and Stevens, two pulmonary function tests, and the testimony of the plaintiff and his wife. The ALJ also relied on his own observations, remarking that the plaintiff "could ambulate without problems and was able to sit for almost one hour at the hearing", (Tr. 10) and that "he did not have any problems of breathing, wheezing, or coughing." (Tr. 11) Stating that he considered all medical and testimonial evidence, the ALJ concluded that "the medical evidence does not present a posture that would substantiate these essentially subjective complaints." (Tr. 10).

The uncontradicted medical evidence which was based upon objective testing, requires reversal of the Secretary's decision. The ALJ's findings numbered 5 and 7 are not supported by substantial evidence.

■ The ALJ acknowledges the aortic aneurysm as one of plaintiff's several medical conditions but he does not address it specifically. The medical evidence indicates that since discovery in August 1979, it has increased in size from five cm. to eight cm. in May, 1981. According to treating physician McKee's evaluation, surgical correction, is inadvisable because of intervening problems. (Tr. 167). Dr. McKee stated that the aneurysm will have to be repaired before it spontaneously ruptures. (Tr. 167). However, there is no indication of when it will be advisable relative to his other medical problems. The undisputed evidence shows that the plaintiff's aneurysm to be equal to an Appendix I impairment.

The impairments listed in Appendix I have been legislatively determined to be severe enough in themselves to prevent a person from doing any gainful activity. That is, if an impairment suffered by a claimant fits into Appendix I, the ALJ may not inquire farther. "Most of the listed impairments are permanent or expected to result in death, or a specific statement of duration is made. For all others, the evidence must show that the impairment has lasted or is expected to last for a continuous twelve month period." 20 C.F.R. § 404.-1525.

> Section 4.11(A) of Appendix I states: Aneurysm of aorta or major branches (demonstrated by roentgenographic evidence). With: (A). Acute or chronic dissection not controlled by prescribed medical or surgical treatment.

The aneurysm meets the Appendix I requirement since it cannot be surgically repaired because of plaintiff's other medical conditions. The medical reports indicate that it should be repaired in the future (at least before it ruptures). Thus, the record shows that death is almost certain if the aneurysm is not repaired; yet surgery cannot be scheduled during the foreseeable future. Substantial evidence does not exist for finding claimant's aneurysm outside of the Appendix I definition.

■ Even if reasonable minds could disagree as to whether plaintiff's aneurysm fits into Appendix I, the undisputed medical evidence shows many unrelated impairments *in combination* are severe enough to preclude the plaintiff from doing substantial gainful activity. Substantial evidence does not exist in the record for concluding otherwise.

The Secretary will consider the combined effects of unrelated impairments only if they all are severe and are expected to last twelve (12) months. 20 C.F.R. § 404.1522 (1982). If the impairment is "equal to a listed impairment", the Secretary must conclude, as a matter of legislative mandate, that the plaintiff is disabled without evaluation of age, education and work experience. 20 C.F.R. § 404.1520(d) (1982).

Therefore, within the meaning of both C.F.R. § 404.1522 and § 404.1520(d) (1982), the plaintiff would be able to stack the emphysema, abdominal aortic aneurysm, and lower back impairments if all meet the duration requirement (12 continuous months or expected to result in death) and are severe. Maladies are "severe" if the ailments prevent the claimant from doing "basic work activities". See 20 C.F.R. § 404.1520(c) & (d); § 404.1521. While, arguably, plaintiff's pulmonary problems, taken alone, are insufficient to fit into Appendix I, the uncontroverted medical evidence shows this ailment to be "severe" and long term.

The instant case may be distinguished from *O'Bryan v. Weinberger,* which upheld denial of disability benefits because the pulmonary capacity study indicated that the claimant's breathing capacity was within normal limits, thereby constituting substantial evidence that the claimant was not disabled by emphysema. 511 F.2d 68 (6th Cir.1975). In *O'Bryan,* the claimant had an abdominal aneurysm repaired successfully and based his disability claim on emphysema only. Each member of the Sixth Circuit

concluded from reading the briefs that O'Bryan would not be able to work again. *Id.* at 69. Nevertheless, the court strictly adhered to its appellate function of determining whether the Secretary's findings were supported by substantial evidence rather than decide the case *de novo.* In the present case, Mr. Wilson's pulmonary function tests put him quantitatively close to the Appendix I impairment and there is uncontroverted evidence that he has a "severe pulmonary impairment." In addition, Mr. Wilson does not rely on just the emphysema to support his disability claim. The plaintiff testified that he could walk only one and one-half blocks before running out of breath. (Tr. 51) He also testified that he became exhausted easily while counseling students (Tr. 53). Further, the uncontroverted medical evidence supported by objective laboratory results is that this claimant "cannot lift more than five (5) pounds", and then infrequently. He also is not able to walk up stairs or sit for more than thirty (30) minutes at a time.

■ The ALJ dismissed two treating physicians' characterizations of the plaintiff's disability as total and permanent with regard to any type of employment. The ALJ has this discretion under 20 C.F.R. § 404.1527. The Secretary is not bound by the medical expert's opinion, even if it is uncontradicted. *Rhodes v. Schweiker,* 660 F.2d 722, 723 (9th Cir.1981). However the Ninth Circuit requires that the rejection "must be accompanied by clear and convincing reasons for doing so." *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir.1975); *Whiteglove Building Maintenance, Inc. v. Brennan,* 518 F.2d 1271 (9th Cir.1975); *Hassler v. Weinberger,* 502 F.2d 172, 178 (7th Cir.1974). Here, the ALJ concluded that "the medical evidence does not present a posture that would substantiate these essentially subjective complaints". (Tr. 10). The Secretary advanced no specific reasons for the rejection. On the contrary, he concedes that Mr. Wilson suffered a physical impairment. But he counters that "their mere presence does not establish a disability—the test is ability to perform substantial gainful activity." *Waters v. Garner,*

452 F.2d 855 (9th Cir.1971). "[T]he opinion of the examining doctor, standing *alone,* may establish total incapacity for substantial gainful activity." *Rhodes v. Schweiker,* 660 F.2d 722, 723–24 (9th Cir.1981) citing *Allen v. Weinberger,* 552 F.2d 781, 785–786 (7th Cir.1977). In *Allen* the ALJ refused to accept "as factual" the repeated statements of the examining doctor that the plaintiff was totally and permanently disabled because the statements were not supported by any clinical findings. The *Allen* court recognized the general rule that the weight to be given the doctor's statement depends on the extent to which it is supported by the clinical findings. In the instant case, the doctors' conclusions are clearly supported by clinical findings.

The ALJ apparently based his rejection of the doctors' findings on his appraisal that the severity of the impairments is not enough to award disability benefits. Again, the ALJ must support such a rejection with clear and convincing evidence. *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir.1975). The instant case may be distinguished from *Day* because in *Day* the court reversed the ALJ's denial of benefits because his reliance on the fact that none of the medical experts had been able, through the use of objective diagnostic techniques, to identify the specific cause of the claimant's pain; his use of medical textbooks outside the record, and his reliance on his own observations, did not constitute substantial evidence. In the instant case, the medical experts have supported their diagnoses by objective techniques as well as other clinical conclusions. Here, the ALJ agrees that the impairments exist, but questions the severity. The Seventh Circuit in *Allen* found that "where the examining doctor was in close contact with and had examined the plaintiff on several occasions, his opinion, although phrased as an ultimate conclusion on the question, was entitled to consideration as an indication of *how severe* her patient's impairment was at the time of the examination." 552 F.2d 781, 785–86 (7th Cir.1977). Citing *Allen,* the Ninth Circuit noted that the examining doctor's opinion is entitled to more than

passing consideration. *Rhodes v. Schweiker,* 660 F.2d 722, 724 (9th Cir.1981).

■ Finally, the ALJ was not convinced by Wilson's subjective allegations of inability to breath, walk and sit, based on his personal observations of Wilson at the hearing, even though there is no hint or suggestion of malingering in the record. "He could ambulate without problems and was able to sit for almost one hour at the hearing". (Tr. 10) "At the hearing, he did not have problems of breathing, wheezing or coughing". (Tr. 11). It is within the power of the Secretary to make findings concerning the credibility of a witness since he is able to observe witness demeanor. *Smith v. Secretary,* 457 F.Supp. 145 (D.Md.1978), *aff'd,* 610 F.2d 813 (4th Cir.1979). In *Day v. Weinberger,* the court concluded that the ALJ's observations at the hearing were insufficient to support the finding in light of two uncontradicted medical opinions supporting the disability.

The D.C. District has held that "[d]espite the ALJ's statement that he considered the combined effects of the impairments, the decision does not discuss any interrelation or cumulative effect of the tuberculosis, hypertension and pulmonary disease (R. 12). The denial of benefits is therefore reversible on that ground." *Larry v. Harris,* CCH Unemployment Ins.Rptr. 9117,375 at 2267–70. In *Larry,* the ALJ determined that claimant's tuberculosis was minimal and inactive; that his hypertension was mild and had resulted in no end organ damage; and that his chronic obstructive pulmonary disease was not of sufficient severity to reach the level of Appendix I. The United States Court for the District of Columbia reversed on several grounds including the deficiency in consideration of the combined effect of ailments.

■ The ALJ notes "[p]ast hearing reports, although they functionally proscribe heavy exertion because of breathing and the threat of an aneurysm bursting, do not add prohibition to light and/or sedentary work ...." (Tr. 10) Again, this analysis ignores both Dr. Stevens' (claimant cannot do any type work) and Dr. McKee's (cannot lift more than 5 pounds) reports. In this respect, see also 20 C.F.R. § 404.1567(a) (sedentary work involves lifting no more than 10 pounds). Accordingly, based upon the undisputed medical evidence in the record, this court must conclude that substantial evidence does not exist for finding the residual functional capacity for doing any kind of work. See 20 C.F.R. § 416.920(f). Thus, even if reasonable minds could differ with respect to whether plaintiff's impairments in combination equal a listed impairment in Appendix I, REVERSAL rather than REMAND is required.

■ This court would also note in passing that a further alternative basis exists for concluding that the ALJ's finding No. 7 (plaintiff can return to his former work) is not supported by "substantial evidence". Dr. McKee has noted the stressfulness of plaintiff's job in several reports. (Tr. 193, 194, 195, 197, 198). The plaintiff testified that his job is stressful. (Tr. 53).

According to plaintiff's supervisor, John B. Liboky:

This job requires a great deal of energy and long hours of work. With the additional federal regulations and funding, the job became very stressful to him the last three years of work.

Mr. Wilson was very conscientious in his work and worked very long hours but simply could not continue the stressful work with his present health situation.

(Tr. 208). See, also, 20 C.F.R. § 404.1521(b)(5).

It should be stated that the ALJ may have been mislead by a medical report which was part of the claimant's file, but which report clearly does not belong to the plaintiff. This erroneously filed medical report is from Dr. Christopher Stahler. (Tr. 187–88). The subject of the report is another William Wilson who is 68 years old, diabetic, and an orchard worker. There is enough of a similarity in medical complaints between the "wrong" Mr. Wilson and the claimant so that consideration of the report could be misleading. This is so since Dr. Stahler found no aneurysm in his patient (the "wrong" Mr. Wilson) and diagnosed arteriosclerosis obliterans with right super-

ficial occlusion and left superficial femoral stenosis and bilateral asymptomatic carotid bruits. While there is no reference to this erroneously filed report in the ALJ's findings, Secretary's brief includes reference to the report at p. 3, 11. 1–5.

## CONCLUSION

To summarize, substantial evidence does not exist in the record for finding that plaintiff can return to his former job. Indeed, this court is unable to find substantial evidence in the record to permit consideration of whether claimant can perform any type of sedentary work. In addition, as stated earlier, the agency conclusion that plaintiff's impairments, taken singly or in combination do not preclude gainful employment, is unsupported by substantial evidence. Consequently, the government's motion for summary judgment must be and is DENIED, plaintiff's motion for summary judgment is GRANTED, and the decision of the Secretary is REVERSED. The Secretary is directed to compute and disburse the appropriate benefits to the claimant.

IT IS SO ORDERED.